(86 App. Div. 195.)

### SEYBOLD et al. v. SUPREME TENT OF KNIGHTS OF THE MACCABEES OF THE WORLD.

(Supreme Court, Appellate Division, Fourth Department.   July 7, 1903.)

1. LIFE INSURANCE—SUICIDE—BURDEN OF PROOF.

In an action on a life insurance policy, the burden was on defendant to establish its defense that deceased committed suicide.

2. SAME—QUESTION FOR JURY.

In an action on a life insurance policy, on issue of suicide, if there was a dispute as to controlling facts, or if the undisputed facts were so inconclusive in their nature that reasonable men might draw different inferences, an issue of fact was presented for a jury.

3. SAME—EVIDENCE.

Evidence, in an action on a life insurance certificate, showing an intentional death by hanging, examined, and *held* that a jury would not have been warranted in finding that death was the result of murder, and therefore there was no issue of fact for the jury.

McLennan, J., dissenting.

Appeal from Trial Term, Seneca County.

Action by John G. Seybold and others against the Supreme Tent of the Knights of the Maccabees of the World.   A verdict was directed for defendant, and from an order granting a new trial defendant appeals.   Reversed.

Argued before ADAMS, P. J., and McLENNAN, WILLIAMS, and HISCOCK, JJ.

Love & Quackenbush, for appellant.

H. E. Miller, for respondents.

HISCOCK, J.   This action was brought to recover $3,000 upon a certificate issued by the defendant on or about December 14, 1899, to and upon the life of one Reynold Seybold, payable to his wife and two children in equal shares.   Concededly, under the terms of said certificate, no benefit or insurance became payable thereunder in case of death of the member or insured as the result of suicide within five years after admission to the order, whether the member taking his own life was sane or insane at the time.   The deceased was found dead by hanging upon the morning of January 20, 1900, and the only defense relied upon at the trial was that said death was the result of suicide.   There was no question but that death resulted from intentional hanging.   The only question litigated was whether it was the result of suicide or of murder.   As already stated the learned trial justice at the close of the trial directed a verdict for the defendant, and upon the theory that the evidence established as matter of law that death was the result of suicide.   While no opinion was written by him upon making the order setting aside said verdict and granting a new trial, it is to be presumed that such order was the result of a conclusion reached upon his part that the evidence presented would have entitled a jury to find that the death was the result of murder.

¶ 1. See Insurance, vol. 28, Cent. Dig. § 1663.

We think that the evidence would not have justified a jury in reaching such a conclusion, but that the first disposition by the trial justice was correct, and the order now appealed from must be reversed.

The only questions presented upon this appeal arise in connection with the issue already stated, whether the death of the deceased was caused by himself or by others, and necessarily, in passing upon such questions, we must quite fully review the evidence for the purpose of ascertaining whether an issue of fact was presented for the consideration of a jury. The deceased was found early in the morning of January 20, 1900, hanging from the railing upon the platform of a secluded portion of the freight depot of the New York Central & Hudson River Railroad, in the village of Waterloo. One rope had been tied around the railing. Through this had been passed another one about 48 inches long, of which one end was around the neck of the deceased, and the other attached to his hands or wrists, which were tied behind his back and pulled well up. The railing was not a high one, and the feet of the deceased were only a few inches from the ground. A rag had been tied around the lower part of his face, covering part of his mouth. The condition of the body, when found, indicated that he had been hanging there some time. The deceased had on all of his clothes except an overcoat, and they were not disarranged, except in one respect. A few feet from where the body was found was some recently passed human excrement. The pants had been unbuttoned from the suspenders and in front, except that, when found, the top button was buttoned and the pants had slid down over the legs. Upon the rubbers were found ashes corresponding to those upon the ground between the spot where the excrement was found and the place where the deceased was hanging. It seems to have been assumed upon the trial that the overcoat found hanging upon the railing was that of the deceased. It is claimed upon the appeal that there was no direct evidence that it belonged to him, and we think such is the fact. It is, however, significant that upon the trial the wife and daughter, who must have known whether it was his overcoat or not, did not give the evidence which lay in their power to give disputing his ownership, if such was the fact. There was found, near by, a soiled handkerchief, and it perhaps may be fairly said that there was dispute whether such handkerchief was his. The deceased was about 50 years of age, about 5 feet 7½ inches tall, of heavy weight, and an extremely muscular and well-developed person. There was not found on his clothes, or on his body, or near by, the slightest sign of any struggle. The evidence in behalf of the defendant disproves the existence of such signs, and that upon the part of the plaintiffs does not contradict it. The deceased was thoroughly familiar with this building and the yard where he was found. He was a peddler, and had occasion frequently to go there, and upon one or more occasions had made inquiries about the secluded character at night of the spot where he was found. He was seen around the village about 8 o'clock the preceding evening, and between that time and the hour when his dead body was found there was no occasion whatever for him.

to visit this spot upon any legitimate or ordinary business. It must be assumed that he either went there voluntarily for the purpose of hanging himself, or else that somewhere upon the streets of the village of Waterloo, at a comparatively early hour, he was by force and violence abducted and carried off to this scene of his execution.

Some witness stated that at some time after midnight she heard somebody, not far from the spot, say, in substance, "Go on; what are you afraid of?" or words to that effect. The statement of this occurrence is not, however, in any way whatever connected with the death of the deceased, and it is a mere matter of conjecture that it had any relation whatever to it.

The evidence would fairly have permitted a jury to find that the deceased was, generally speaking, of a happy disposition, comfortably situated, and happy in his family relations. Upon the other hand, there is an abundance of evidence indicating that, for a considerable period running back from the date of his death, deceased had been troubled with severe pains in his head, and that he had made remarks indicating a fear and foreboding upon his part that as a result of them he might become insane. There is also the evidence of one witness that some time prior to his death the deceased had complained about his family relations. So far as the evidence discloses, the deceased had not an enemy in the world, and there did not exist the slightest cause, reasonable or unreasonable, why anybody should desire to take his life. There is not the slightest pretense that there was any attempted robbery in connection with his death.

Upon the 13th and 27th, respectively, of the preceding month, the deceased had been the subject of two peculiar occurrences, which are claimed by respondents to have indicated attempts by others to take his life, and which, it is insisted by appellant, indicate a design by him at those times to commit suicide. To our mind, tested by what was actually observed and known, rather than by mere statements of the deceased, the evidence indicated much more clearly attempts at self-destruction than murder. We do not see anything in the evidence relating to these occurrences which legitimately at all sustains the claim that death came as the result of the violence of others.

The general principles of law which must govern us in our disposition of this appeal are perfectly well established, and not at all complex. Upon the trial the burden rested upon the defendant to establish, by a preponderance of evidence, its defense that the deceased came to his death as the result of suicide. If there was a dispute in the evidence as to the controlling facts, or if, there being no dispute as to said facts, the latter were still so inconclusive in their nature that reasonable men might draw different inferences therefrom, an issue of fact was presented which should have been passed upon by a jury. Upon the other hand, it would not have been permissible to allow a jury to indulge in conclusions and deductions which were not legitimately and legally deducible from the facts testified to, but which would be mere speculation and guesswork. No principles have been laid down in any of the recent decisions referred to which in any way destroy or impair such well-

grounded rules. Keeping such principles in our mind, it seems to us that the defendant produced evidence which fairly and legitimately sustains the claim that the deceased committed suicide, and that, upon the other hand, to permit a jury to find that he was murdered, would be to allow the wildest kind of speculation to pass for legitimate inference.

We start upon our consideration with the necessary concession that death was the result of intention. There was no accident about it. Upon the night in question either the deceased sought out this secluded spot, with which he was thoroughly familiar, and about the lonesomeness of which he had made previous inquiries, and there committed suicide, or else with force and violence he was abducted somewhere in the quiet and peaceable village of Waterloo, and carried to the spot where found, and violently murdered. The latter hypothesis seems to us absolutely fanciful, unnatural, and unwarranted. There is not the shadow of an explanation why it should have been done. There is not to our mind a single circumstance surrounding the scene of the death which fairly indicates that it was done. The learned counsel for the respondents specially refers to the testimony of Mrs. Dutcher, and already mentioned, in which she says she heard some man calling, "Come on, come on; what are you afraid of?" to the way in which the rope was tied and the hands found pulled up behind the back; to the cloth around the neck and in the mouth; to the handkerchief and coat found near by. We have already commented upon these facts so far as we care to, except the adjustment of the rope and of the cloth around the face or mouth, and an examination of the evidence relating to them, we think, will clearly disclose that there was nothing about the adjustment which made it impossible or even very difficult for the deceased to have perfected it himself. Upon the other hand, we have the evidence of the fact that Seybold was brooding over the condition of his head, and over what people might say with reference to one of the prior occasions when, as we believe, he had attempted to commit suicide; and especially we have the condition of his clothes and his body, indicating very naturally, in the first place, that voluntarily and peacefully, before hanging, he had complied with the demands of nature, and, in the second place, absolutely repudiating the suggestion of those struggles which must have ensued if other parties had somewhere in the village of Waterloo seized this concededly strong and muscular man and by violence taken him to the spot in question, and there, under such difficulty of facilities as existed, violently and murderously caused his death by hanging.

The learned counsel for the respondents dwells much upon the presumptions which surround this case. He correctly cites the rule, which applies under some circumstances, that a presumption exists against the theory of self-destruction by a sane man, and says that this man was sane. But to our minds, based upon those results of current observation of which we may take judicial notice, a much stronger presumption exists against the theory of seizure of a person somewhere upon the streets of a law-abiding community, without any motive or explanation, for the purpose of murdering him

in so unusual a manner as this would have been. We have no doubt that experience and statistics would amply demonstrate that death in this part of the country, as it was found in this case, more ordinarily and commonly results from suicide than from murder.

Respondents have especially relied upon the cases of Landon v. Preferred Accident Ins. Co., 43 App. Div. 487, 60 N. Y. Supp. 188, and Washburn v. National Accident Association (Sup.) 10 N. Y. Supp. 366, as sustaining his contention of a presumption against suicide in this case. In the Landon Case the issue was between the theory of suicide and an accidental death, and the court referred specially to the fact that there was evidence of a struggle that the deceased made in the water. So, in the Washburn Case, there were some facts which strongly tended to disprove the theory of suicide, and which naturally and legitimately made the same a question of fact for a jury. The case at bar seems to us to be much more like that of Pagett v. Connecticut Mutual Life Insurance Company, 55 App. Div. 628, 66 N. Y. Supp. 804. In that case, as in this, the issue was distinctly presented whether death had been the result of suicide or murder. In some respects the facts, in our opinion, were less decisive in favor of the theory of suicide than in this case. The case was argued and the decision based upon the ground that the verdict of the jury against the claim of suicide interposed by the defendant was against the weight of evidence. The learned justice who wrote the memorandum opinion on behalf of the court, however, took occasion to expressly state that the conclusion of murder reached by the jury would not be justified by the evidence, that there was no room for saying that the death was accidental, and that it would be difficult to avoid the conclusion that it was a case of self-destruction.

Under the provisions of the certificate issued by defendant, a right of recovery was given for certain premiums paid by the insured in case recovery of the full amount of the certificate was defeated by the defense of suicide. In this case such premiums amount to about $8, and it is insisted by respondents that it was proper to grant a new trial because of plaintiffs' right to a verdict for such small amount. We do not, however, think that the order appealed from should be affirmed upon this ground. The case was not tried at all upon that theory, and at the time of its disposition by the trial justice, through the direction of a verdict, no suggestion was made on behalf of the plaintiffs that they were entitled to recover upon such theory or for such amount. If, holding as we do upon the substantial features of the case, we should sustain the order upon the ground mentioned and allow a new trial, plaintiffs would suffer, rather than otherwise, through the recovery of a small sum, which would carry costs against them. Upon the other hand, we think that a judgment entered in favor of the defendant upon the issues tried, under all of the circumstances, would not be a bar to a proper action to recover such assessments, if plaintiffs desire to bring it.

· We do not think that any of the exceptions to the admission or rejection of evidence urged upon our attention by the respondents present any such error committed upon the trial as will sustain the order granting a new trial. The order appealed from should be re-

versed, with costs of this appeal, and respondents' motion for a new trial denied, with $10 costs.

Order reversed, with costs, and respondents' motion for a new trial denied, with $10 costs. All concur, except McLENNAN, J., who dissents upon the ground that the manner of the death of plaintiffs' intestate was a question of fact for the jury to determine.